IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 3, 2025

**IN RE DOERRIAN K. ET AL.**

**Appeal from the Juvenile Court for Gibson County
No. 27JC1-2024-JT2     J. Mark Johnson, Judge**

**No. W2025-00158-COA-R3-PT**

A mother appeals the juvenile court's order terminating her parental rights to her five children. The juvenile court found three grounds for termination and determined that termination was in the children's best interests based on clear and convincing evidence. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which THOMAS R. FRIERSON, II, and CARMA DENNIS MCGEE, JJ., joined.

William A. Godwin, Alamo, Tennessee, for the appellant, Savannah K.

Jonathan Skrmetti, Attorney General and Reporter, and Allen T. Martin, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

OPINION

FACTUAL AND PROCEDURAL BACKGROUND

This case concerns the termination of the parental rights of Savannah K. ("Mother") to her five children: Montana K. (born in 2011), Doerrian K. (born in 2014), Tagan K. (born in 2016), Lilith K. (born in 2017), and Lorenzo K. (born in 2020) (collectively, "the children"). Mother is married to the children's father, Skye K. ("Father").[1] The Tennessee

---

[1] Father's rights were also terminated. However, Father has not appealed and, therefore, will be mentioned only as necessary for Mother's appeal.

Department of Children's Services ("DCS" or "the Department") first became involved with the family in 2018, when it filed a petition in the Juvenile Court for Gibson County, alleging that the four[2] children, Montana, Doerrian, Tagan, and Lilith, were dependent and neglected because of psychological harm, drug exposure, lack of supervision, and environmental neglect. These allegation stemmed from DCS being called, along with the police, to Mother's home because Mother had allegedly stabbed Father in the neck while both were using methamphetamine. The Department reported that the children had Father's blood on them because of the stabbing. The juvenile court found the children to be dependent and neglected,[3] and the children were placed in DCS's custody for one year, until the parents regained custody in August 2019.

The Department became involved in the family's life again on January 9, 2024, when it filed a petition against both parents, alleging that all five children were dependent and neglected because of exposure to methamphetamine and environmental neglect. The children were then removed from Mother's home. The petition alleged that DCS had received a referral of drug-exposed children and, in addition to police, had visited Mother's home, which it observed to be "extremely unclean with clothes, trash and dishes strewn throughout." Additionally, "the kitchen sink was observed to have standing, dirty water and was nonfunctional." Mother also showed the police a pipe she used to smoke methamphetamine in her bedroom. Both parents were appointed counsel and, after a hearing, the juvenile court entered an order on May 14, 2024, finding the children to be dependent and neglected due to drug exposure and environmental neglect. The juvenile court also found all of the children to be victims of severe child abuse. Neither parent appealed this order. The children have since remained in DCS's custody.

Mother was arrested for child abuse and neglect due to the condition of the home and the presence of drugs in the home. She was charged with three counts of child abuse and neglect of a child eight years of age or less and two counts of child abuse and neglect of a child over eight years of age. These charges stemmed from Lilith, Lorenzo, Doerrian, and Tagan testing positive for methamphetamine and the presence of methamphetamine in the home. Mother pleaded guilty to one count of child abuse and neglect of a child under eight years of age, and the remaining charges were dismissed. She was sentenced to eight years' imprisonment, of which 11 months and 29 days were to be served in prison. The remaining sentence was to be served on supervised probation.

On September 3, 2024, DCS filed a petition to terminate the parental rights of both parents. In the petition, DCS alleged the grounds of abandonment by an incarcerated parent, severe child abuse, failure to manifest an ability and willingness, and being

---

[2] Lorenzo was not yet born.

[3] Neither the petition nor the order finding the four children to be dependent and neglected is included in the record.

sentenced to more than two years because of child abuse. The petition also alleged that termination was in the children's best interests. A trial on the petition was held on December 6, 2024. Mother was incarcerated at the time; she was transported to court for the trial and was present throughout the proceedings. The Department introduced twenty-nine exhibits. Testimony was then given by Mother, Father, and Jocelyn Reyes, the DCS case manager assigned to the family. Mother's testimony primarily consisted of the events that led to the children's removal and the termination petition. Mother also testified about her plans after being released from prison. Father's testimony was much more limited as his counsel had advised him to "plead the 5th" to every question, which Father generally did. Ms. Reyes testified regarding her interactions with the family and the status of the five children. At the close of the trial, the court took the matter under advisement.

On January 6, 2025, the trial court[4] entered an order terminating the rights of both parents and incorporated a prior memorandum opinion by the court that detailed its findings of fact and conclusions of law. The court found that DCS had failed to properly plead the ground of abandonment by an incarcerated parent and dismissed this ground. The court found DCS had proven the remaining three grounds by clear and convincing evidence and that termination was in the children's best interests.

Mother timely appealed and presents only the issue of whether termination was in the children's best interests. The Department, recognizing that a consideration of best interests alone is insufficient under our Supreme Court's precedent, presents the additional issue of whether the trial court correctly found grounds to terminate Mother's rights.

STANDARD OF REVIEW

The Tennessee Supreme Court has found "that both the United States and Tennessee Constitutions protect parents' rights to the custody and care of their children." *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). This right is "'far more precious than any property right.'" *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982)). While the right is fundamental, parents may forfeit this right by engaging in conduct that substantially harms their children; in such cases, the state may initiate proceedings to terminate the parents' rights. *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010). Termination of parental rights must be based on clear and convincing evidence that grounds for termination exist and that termination of the parent's rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(1)-(2); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013).

After a court conducts a trial sitting without a jury, we review its findings of fact de novo upon the record accompanied by a presumption of correctness unless the

---

[4] In the interest of clarity, we will refer to the lower court as the "juvenile court" when referring to the dependency and neglect proceedings and as the "trial court" when referring to the termination proceedings.

preponderance of the evidence is otherwise. TENN. R. APP. P. 13(d); *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). In parental termination cases, "the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524. The petitioner bears the burden of showing clear and convincing evidence regarding both requirements of the termination statute. *In re Angela E.*, 303 S.W.3d at 250. Clear and convincing evidence "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts" and "eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596. "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

ANALYSIS

I.

We first address the grounds for termination that the trial court found to be proven by clear and convincing evidence.[5] Although Mother does not raise an issue regarding the grounds for termination or provide any briefing on the grounds, we are mindful of our Supreme Court's directive in *In re Carrington H.*, and we will address each ground. 483 S.W.3d at 525-26 ("[I]n an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.").

A. Severe Child Abuse

The first ground upon which the trial court terminated Mother's parental rights was severe child abuse. The relevant statute, Tenn. Code Ann. § 36-1-113(g)(4),[6] states that termination proceedings may be instituted when:

> Under a prior order of a court or by the court hearing the petition to terminate
> parental rights or the petition for adoption, a child has been found to be a
> victim of severe child abuse, as defined in § 37-1-102, and the parent or

---

[5] The trial court found that DCS did not plead the ground of abandonment by an incarcerated parent properly and does not challenge this finding on appeal. Therefore, we do not address this ground. *See In re Disnie P.*, No. E2022-00662-COA-R3-PT, 2023 WL 2396557, at *5 (Tenn. Ct. App. Mar. 8, 2023) (concluding that it is not necessary for this Court to review grounds that were not proven in the trial or challenged on appeal).

[6] We apply the statutes in effect when the termination petition was filed in 2024.

- 4 -

guardian has been found to have knowingly or with gross negligence either committed severe child abuse or failed to protect the child from severe child abuse.

In the dependency and neglect proceedings, the juvenile court found that Tagan, Lorenzo, and Lilith were all children under eight years old at the time of removal and were exposed to methamphetamine, such that each of them tested positive for methamphetamine. The statute relevant to these children defined severe child abuse to include "[t]he ingestion of an illegal substance or a controlled substance by a child under eight (8) years of age that results in the child testing positive on a drug screen[.]" *Id.* § 37-1-102(b)(27)(E). Regarding Montana and Doerrian, the juvenile court found that Mother had knowingly allowed these children to be within a structure where methamphetamine was present and accessible to the children. The statute relevant to these children defined severe child abuse to include "[t]he presence of a child within a structure where any of the following controlled substances are present and accessible to the child: . . . (iii) Methamphetamine[.]" *Id.* § 37-1-102(b)(27)(F)(iii).

On May 14, 2024, the juvenile court entered an order adjudicating all of the children dependent and neglected and finding them to be victims of severe child abuse perpetrated by Mother. Mother did not appeal the juvenile court's order. Therefore, under Tenn. Code Ann. § 36-1-113(g)(4), Mother was "found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court," specifically, the order of the juvenile court. Once this finding became final, any challenges to it became barred. *See In re Lola-Rayne D.*, No. M2024-00980-COA-R3-PT, 2025 WL 2161114, at *3 (Tenn. Ct. App. July 30, 2025) (collecting cases stating that parents may not relitigate the juvenile court's previous finding of severe child abuse in a termination proceeding because this finding is res judicata).

In its termination order, the trial court stated, in pertinent part:

In this case, the Court found both parents had committed severe child abuse as to all five (5) children during the 2024 dependency and neglect proceeding. This finding was not appealed by either parent. Under the language of *In re William W.* (supra), the Court finds its previous ruling on this issue is res judicata and concludes that clear and convincing evidence exists to support and establish this ground for termination as to both parents.

The trial court properly determined that DCS had proven this ground by clear and convincing evidence, and we affirm.

B.  Sentenced to More Than Two Years Imprisonment

The next ground upon which the trial court terminated Mother's rights is found in Tenn. Code Ann. § 36-1-113(g)(5), which provides that parental rights may be terminated if:

> The parent or guardian has been sentenced to more than two (2) years' imprisonment for conduct against a child that has been found under any prior order of a court or that is found by the court hearing the petition to be severe child abuse, as defined in § 37-1-102. Unless otherwise stated, for purposes of this subdivision (g)(5), "sentenced" shall not be construed to mean that the parent or guardian must have actually served more than two (2) years in confinement, but shall only be construed to mean that the court had imposed a sentence of more than two (2) years upon the parent or guardian[.]

The record shows that Mother pleaded guilty to one count of child abuse and neglect of a child 8 years of age or less. Mother was sentenced to eight years of imprisonment, with seven years suspended and to be served as supervised probation. Mother's sentence falls within the ambit of this termination ground. *See In re Kaitlyn D.*, No. M2023-00658-COA-R3-PT, 2024 WL 1049483, at *11 (Tenn. Ct. App. Mar. 11, 2024). The trial court also found that Mother's conviction under Tenn. Code Ann. § 39-15-401(d)(1)[7] fell within the definition of severe child abuse provided in Tenn. Code Ann. § 37-1-102(b)(27)(E). We agree. The same conduct constituted the basis for Mother's guilty plea and the juvenile court's finding of severe child abuse, i.e., Mother keeping methamphetamine in the home and exposing the children to methamphetamine such that they returned positive drug tests. Therefore, the trial court correctly found that this ground had been proven by clear and convincing evidence.

---

[7] Tenn. Code Ann. § 39-15-401(d) provides that:

> (1) Any person who negligently, by act or omission, engages in conduct that places a child in imminent danger of death, bodily injury, or physical or mental impairment, commits a Class A misdemeanor; except that, if the abused child is eight (8) years of age or less, the penalty is a Class B felony.
> (2) For purposes of this subsection (d), a person engages in conduct that places a child in imminent danger of death, bodily injury, or physical or mental impairment if the person's conduct related to the controlled substance methamphetamine or any other controlled substance listed in chapter 17, part 4 of this title, except a Schedule VI controlled substance, exposes the child to the controlled substance and an analysis of a specimen of the child's blood, hair, fingernail, urine, or other bodily substance indicates the presence of methamphetamine or any other controlled substance listed in chapter 17, part 4 of this title, except a Schedule VI controlled substance, in the child's body.

C. Willingness and Ability to Assume Custody and Risk of Substantial Harm

The final ground found by the trial court is whether Mother had failed to manifest an ability and willingness to assume custody or financial responsibility for the child, pursuant to Tenn. Code Ann. § 36-1-113(g)(14). This ground provides a basis for termination when:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14).

A party seeking to establish this ground must prove two elements by clear and convincing evidence. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). First, a party must establish that "the parent or legal guardian failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child." *Id.* "If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest *either* ability or willingness, then the first prong of the statute is satisfied." *Id.* at 677. Second, the petitioning party must establish that "placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *Id.* at 674.

The first prong places "a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *Id.* at 677. When considering ability, courts "focus[] on the parent's lifestyle and circumstances." *In re Serenity W.*, No. E2018-00460-COA-R3-PT, 2019 WL 511387, at *6 (Tenn. Ct. App. Feb. 8, 2019). When considering willingness, courts "look for more than mere words" and look to whether the parent has "demonstrated [] willingness by attempting to overcome the obstacles that prevent [him or her] from assuming custody or financial responsibility for the child." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018).

The trial court found that Mother was willing to assume custody but that she lacked the ability. The Department disagrees with the court's finding regarding willingness but acknowledges that Mother's failure to manifest either an ability or willingness is sufficient to satisfy this prong of the test. In support of its conclusion that Mother was willing to assume custody, the trial court made the following findings: Mother was willing to comply with the requirements of her permanency plan; however, the jail lacked the necessary programs. After Mother was transferred to state prison, she began an intensive nine-month-

long drug treatment program, which included a parenting class, counseling, and Narcotics Anonymous and Alcoholics Anonymous programs. Mother was also undergoing mental health counseling and was maintaining contact with the children and their foster parents. In support of its argument that Mother failed to manifest a willingness to assume custody, the Department primarily points to Mother's behavior prior to her arrest. The Department acknowledges that Mother completed a rehabilitation program after the first custodial episode but asserts that her failure to maintain sobriety showed she lacked willingness. The Department's argument does not meaningfully address the trial court's findings regarding Mother's recent behavior, which the evidence does not preponderate against. Therefore, we decline to overturn the trial court's finding.

Regardless of the propriety of the court's finding on the willingness element, the trial court found that Mother lacked the ability to assume custody, a finding the evidence supports. The court found that Mother was serving an eight-year sentence and that she did not know when she was eligible for a parole hearing. Mother testified that, when she was released, she estimated that she would require anywhere from a year and a half to three years before she would be able to assume custody of the children. Therefore, at the time of trial, Mother lacked the ability to assume custody of the children and, even in her estimation, it would be several years before she would be able to do so. Mother testified that, after she was released from prison, she planned to live in a halfway house but did not plan on taking the children there with her. When this testimony is considered in light of Mother's repeated exposure of the children to methamphetamine, environmental neglect, and domestic violence, it is clear Mother lacked the ability to assume custody of the children.

The next prong requires proof that returning the children to Mother's care would pose a risk of substantial harm. *See* Tenn. Code Ann. § 36-1-113(g)(14); *In re Neveah M.*, 614 S.W.3d at 674. The risk of substantial harm must be "'a real hazard or danger that is not minor, trivial, or insignificant,'" and "'[w]hile the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.'" *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

The trial court found that returning the children to Mother's care would create a risk of substantial harm based on her testimony that, upon her release from prison, she intended to resume her relationship with Father. The court "was particularly concerned with the family's history of domestic violence, which underpinned the removal of the children in both dependency and neglect cases; and, the lack of evidence regarding how that issue is to be addressed if the parents reunite." The court noted Father's incarceration at the time of the trial on similar charges to Mother, and that Father refused to answer any questions, which left the court without any evidence regarding his beliefs regarding issues such as whether he had paid support to the children, efforts he had made to create a safe home,

whether he was concerned that the children were repeatedly exposed to methamphetamine, or if he was willing to address his own drug addiction. Therefore, the trial court concluded that, should Mother and Father resume their relationship, as was Mother's intention, returning the children to Mother's care would pose a substantial risk of harm to them. We agree.

A recent history of drug use and domestic violence can support a finding of a risk of substantial harm. *See In re Brianna B.*, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at *6 (Tenn. Ct. App. Jan. 29, 2021) (collecting cases). Similarly, a failure to "cut ties" with another parent who has a history of domestic violence can support a finding of substantial harm. *Id.* Here, Mother had a history of drug use and relapse. Mother also engaged in domestic violence when she stabbed Father in the neck while using methamphetamine. Mother testified she planned to resume her relationship with Father after their release from incarceration. When this is considered with Mother's and Father's history of domestic violence, drug use, and violent arguments, we conclude that placing the children into Mother's custody would undoubtedly create a risk of substantial harm to them. Although Mother was undergoing drug rehabilitation programs while in prison, she had also previously failed to maintain sobriety after participating in these programs. Mother had, therefore, failed to show that she could maintain sobriety. *See In re James W.*, No. E2020-01440-COA-R3-PT, 2021 WL 2800523, at *16 (Tenn. Ct. App. July 6, 2021). Mother also would be unable to provide suitable housing for the children for several years after her release from prison. *See In re Jaylynn J.*, No. M2023-01496-COA-R3-PT, 2024 WL 2933349, at *13 (Tenn. Ct. App. June 11, 2024) (considering a mother's recent history of drug use and "the uncertainty concerning her housing situation after she leaves the halfway house" when finding a risk of substantial harm); *see also In re Jah'Lila S.*, No. W2021-01199-COA-R3-PT, 2022 WL 4362839, at *11 (Tenn. Ct. App. Sept. 21, 2022) (considering a mother's testimony that she would need an additional three years to be in a position to assume custody of the children when finding a risk of substantial harm).

Finally, we cannot ignore the fact that the reason Mother was incarcerated and that the children were removed was that Mother inflicted severe abuse on the children. *See In re Trinity H.*, No. M2020-00440-COA-R3-PT, 2020 WL 5110312, at *11 (Tenn. Ct. App. Aug. 28, 2020) (considering that a father was found to have committed severe child abuse in finding a risk of substantial harm). Mother's home was observed to be unsanitary and unsafe for the children. Most concerningly, Mother used methamphetamine and allowed drug paraphernalia to be within her home and within reach of the children. Mother's drug use also caused four of the children to test positive for methamphetamine. Therefore, returning the children to Mother's care would create a risk of substantial harm to them, and we affirm the juvenile court regarding this ground.

## II.

We have concluded that the trial court correctly found that three grounds for termination existed. Therefore, we turn next to whether the court correctly determined that termination of Mother's parental rights was in the children's best interests. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254.

Our state's termination statutes recognize that not all parental misconduct is irredeemable–meaning that there is a possibility that termination of an unfit parent's rights is not always in the child's best interests. *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). At the best interests stage, the focus shifts to the child's best interests, as viewed from the child's perspective, and the child's interests diverge from those of the parents. *In re Audrey S.*, 182 S.W.3d at 877-78. Facts considered in the best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

When a court is considering whether to terminate a parent's rights, it must consider the non-exclusive list of factors enumerated in Tenn. Code Ann. § 36-1-113(i). *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). "[T]he facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case." *Id.* at 682. To ensure that every parent receives the individualized consideration to which they are entitled, "the best interests analysis is and must remain a factually intensive undertaking." *Id.* Any single factor may dictate the outcome of the analysis, *In re Audrey S.*, 182 S.W.3d at 878, but courts must always consider all of the factors and all relevant proof. *In re Gabriella D.*, 531 S.W.3d at 682.

The first group of factors we examine relates to the children's social and emotional needs.[8] *See* Tenn. Code Ann. § 36-1-113(i)(1)(A), (B), (D). The juvenile court found that the children had been removed from Mother's home twice and had spent a total of two out of the past six years away from Mother between the two removals. Although the children were with Mother between the two removals from 2019 to 2023, during that time, Mother was also using drugs in the home. Several of the children have special needs, for which their foster parents are providing care. Because of these special needs, a sudden change in

---

[8] Because the factors overlap in numerous regards, we group the factors based on themes present within them. *See, e.g.*, *In re Chayson D.*, 720 S.W.3d 123, 144 (Tenn. Ct. App. 2023). Our grouping of these factors together does not diminish the factually intensive nature of the best interest analysis or the individualized consideration of each factor.

- 10 -

caretakers would be detrimental to the children, especially in light of Mother's admission that she will not be ready to provide care for the children for several years. Therefore, termination would have a positive impact on the children's stability, and relatedly, placing the children back in their Mother's care would have a negative impact on the children. *See id.* § 36-1-113(i)(1)(A), (B) (addressing "[t]he effect a termination of parental rights will have on the child[ren]'s critical need for stability and continuity of placement throughout the child[ren]'s minority," and "[t]he effect a change of caretakers and physical environment is likely to have on the child[ren]'s emotional, psychological, and medical condition[s].").

Mother's incarceration and time away from the children have also had a detrimental effect on her parental attachment with the children. As the trial court found, no evidence was presented of a specific attachment with any of the children, and no in-person contact between Mother and the children has occurred since January 2024. Because of this, there is no expectation that Mother could form a secure and healthy parental attachment in the future. *See id.* § 36-1-113(i)(1)(D) ("Whether the parent and child[ren] have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment.").[9]

We next consider the factors related to the parent's behavior towards the children. *See id.* § 36-1-113(i)(1)(E), (N), (S). Mother was incarcerated at the time of the trial, which affected her ability to maintain contact with the children. Mother was to call the children on a weekly rotation, but her calls were inconsistent. Although the trial court found that Mother appeared to have had a desire to cultivate a relationship with the children, her incarceration had hampered any efforts to do so. Mother's incarceration also affected her ability to provide financial support for the children. Although the record contains evidence that she paid some money to the four eldest children, this support ceased after two months, and Mother never provided any support to the youngest child. *See id.* § 36-1-113(i)(1)(E), (S) (addressing "[w]hether the parent has maintained regular visitation or other contact with the child[ren] and used the visitation or other contact to cultivate a positive relationship with the child[ren]," and "[w]hether the parent has consistently provided more than token financial support for the child[ren]."). Mother has shown domestic violence towards Father and abuse towards the children. *See id.* § 36-1-113(i)(1)(N) ("Whether the parent, or other person residing with or frequenting the home of the parent, has shown

---

[9] No evidence was introduced regarding the attachments the children have with their caregivers or siblings, except that three of the children are in one placement and two are in another. Although factors (H) and (I) were relevant to the termination of Mother's rights, we agree with the juvenile court that the lack of evidence regarding these factors precluded their application. *See id.* § 36-1-113(i)(1)(H), (I) ("Whether the child[ren] ha[ve] created a healthy parental attachment with another person or persons in the absence of the parent" and "[w]hether the child[ren] ha[ve] emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child[ren]'s access to information about the child[ren]'s heritage.").

brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult."). Father testified that Mother had stabbed him in the neck, and Mother was charged with domestic violence, although this charge was later dismissed. Mother was found to have subjected all of the children to severe abuse because of her issues with methamphetamine. We agree with the trial court that this factor weighs heavily in favor of termination.

The next group of factors considers the efforts the parent has made to improve their conduct or situation that led to removal. *See id.* § 36-1-13(i)(1)(J)-(M). Mother's incarceration affected whether she could show a sense of urgency in remedying the conditions that led to the children's removal, as she became incarcerated shortly after their removal. *See id.* § 36-1-113(i)(1)(M) (Whether the parent has demonstrated a sense of urgency in establishing paternity of the child[ren], seeking custody of the child[ren], or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child[ren]'s best interest."). However, Mother did not show a sense of urgency in remedying her drug use or the condition of the home prior to the children's removal, and although she was participating in programs while incarcerated that may help her create a safe home one day, this does not change her prior behavior. Because Mother lacked urgency to remedy the conditions that led to the children's removal, we agree with the trial court that this factor favors termination. However, it does appear Mother had taken advantage of programs while in prison. *See id.* § 36-1-113(i)(1)(K) ("Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions."). Mother's incarceration also limited the efforts DCS was able to make to assist Mother; however, it appears DCS made reasonable efforts, especially prior to Mother's incarceration. *See id.* § 36-1-113(i)(1)(L) ("Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department.").

The record also shows that Mother had not demonstrated a lasting adjustment of circumstances to make it safe for the children to return to her care. *See id.* § 36-1-113(i)(1)(J) ("Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child[ren] to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner."). Mother had a history of drug use, relapse, and exposing drugs to the children, and nothing in the record showed that a lasting adjustment had been made as to any of these issues. We agree with the trial court that this factor weighs heavily in favor of termination.

The next group of factors is related to the parent's ability to provide care for the children. *See id.* § 36-1-113(i)(1)(C), (O), (P), (Q), (T). We agree with the trial court that,

- 12 -

at one time, Mother was able to provide care for them. *See id.* § 36-1-113(i)(1)(O) (addressing "[w]hether the parent has ever provided safe and stable care for the child[ren] or any other child."). The Department did not become involved in the family's lives until 2018; after the first removal, Mother complied with DCS's requirements for the return of the children to her care. Mother also provided stable care to the children for several years after their return. Therefore, we agree that Mother did, at one time, provide stable care for the children and that this factor weighed against termination.

However, we also agree with the trial court that Mother had not demonstrated an understanding of the children's needs based upon her behavior and the condition of her home prior to the children's removal. These considerations also lead to the conclusion that Mother failed to demonstrate a commitment to creating and maintaining a home that meets the children's basic and specific needs. As the trial court noted, after 2018, Mother had primarily demonstrated an ability to create a safe home under DCS's supervision and, once DCS's supervision ceased, so too did her ability to create a safe home. Several of the children have special needs, and Mother did not provide any evidence of her understanding of their needs or her ability to care for them. *See id.* § 36-1-113(i)(1)(P), (Q) (addressing "[w]hether the parent has demonstrated an understanding of the basic and specific needs required for the child[ren] to thrive," and "[w]hether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child[ren]'s basic and specific needs and in which the child[ren] can thrive."). Mother also did not demonstrate continuity and stability in meeting the children's needs. *See id.* § 36-1-113 (i)(1)(C) ("Whether the parent has demonstrated continuity and stability in meeting the child[ren]'s basic material, educational, housing, and safety needs."). Environmental neglect, drug addiction, and domestic violence undergirded both removals of the children from their Mother's care. Although Mother was undergoing treatment while in prison, and her testimony included that the family had a stable life at times prior to the removals, she failed to demonstrate stability in meeting the children's needs because she failed to show that she could meaningfully overcome her drug addiction or create a safe home for the children.

Mother's mental fitness, especially as it relates to her drug use and wish to reunite with Father after their respective releases from prison, would likely be detrimental to the children. *See id.* § 36-1-113(i)(1)(T) ("Whether the mental or emotional fitness of the parent would be detrimental to the child[ren] or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child[ren]"). Mother partially blamed her most recent relapse on her sister bringing drugs into the home and failed to take full responsibility for her actions. Similarly, Mother failed to acknowledge the volatility and instability of her relationship with Father, who did not provide the trial court with any evidence regarding his beliefs around drugs, parenting, domestic violence, or his relationship with Mother. This factor weighs in favor of termination.

The remaining factors primarily concern Mother's home environment.[10] Partly because of Mother's incarceration, insufficient evidence was presented to consider these factors, or they are inapplicable. Based on the foregoing, we determine that clear and convincing evidence existed to prove that termination was in the best interests of the children and affirm.

CONCLUSION

The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellant, Savannah K., for which execution may issue if necessary.

/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE

---

[10] *See* Tenn. Code Ann. § 36-1-113(i)(1)(F), (G), (R) (addressing "[w]hether the child[ren] [are] fearful of living in the parent's home," and "[w]hether the parent, parent's home, or others in the parent's household trigger or exacerbate the child[ren]'s experience of trauma or post-traumatic symptoms," and "[w]hether the physical environment of the parent's home is healthy and safe for the child.").